### HAZELTINE CORPORATION et al. v. ELECTRIC SERVICE ENGINEERING CORPORATION.

District Court, S. D. New York. July 1, 1926.

1. Patents ⊂⇒328—1,450,080, for electric circuit for neutralizing capacity coupling in radio receivers, held valid as to claims 1 and 5, and infringed as to claim 1.

Hazeltine patent, No. 1,450,080, for a method of electric circuit arrangement for neutralizing capacity coupling in radio receiving sets, held not anticipated and valid as to claims 1 and 5, and infringed as to claim 1.

2. Patents ⊂⇒6—Statutory law is not concerned with laws and processes of nature, but with means devised to control them.

Statutory law is not concerned with laws and processes of nature which govern the operations of electrical forces, but with visible and tangible means and methods humanly devised to control and employ those forces for useful purpose.

3. Patents ⊂⇒172—Claims of later patent must be strictly construed, to avoid interpretation equivalent to claims of prior patent.

Claims of later patent must be strictly construed, because an interpretation equivalent to claims of prior patent would invalidate them.

4. Patents ⊂⇒246—There is no infringement of patented combination, if single element is omitted from alleged infringing devise unless supplied by an equivalent.

In patent for combination of known elements comprising a particular method or means of accomplishing a given result, every element specified by patentee as entering into the combination must be accepted as material, and there is no infringement, if a single element is omitted from alleged infringing device, unless the omission is supplied by an equivalent device or instrumentality.

5. Patents ⊂⇒328—1,489,228, claims 1, 2, for means for neutralizing capacity coupling in radio audions, held not infringed.

Hazeltine patent, No. 1,489,228, claims 1, 2, for method and means for neutralizing capacity coupling in audions in radio receivers, held not infringed.

6. Patents ⊂⇒82—War Department employee, amending his application before issuance of patent and withdrawing stipulation for public use, held not to have dedicated invention to public under original application (Comp. St. §§ 9430, 9441).

Where employee of War Department, who filed application for patent under Act March 3, 1883 (Comp. St. § 9441), reciting that invention may be used by federal government, or by any person in United States without payment of royalty, before patent was issued, was permitted to amend application and pay statutory fee, on which patent was issued under Rev. St. § 4886, as amended by Act March 3, 1897, c. 391, § 1 (Comp. St. § 9430), held, that there was no dedication of invention to public.

7. Patents ⊂⇒283(8)—Government employee, amending his application to eliminate dedication to public before issuance of patent, held not estopped as against alleged infringer (Comp. St. §§ 9430, 9441).

Where employee of War Department, who filed application for patent under Act March 3, 1883 (Comp. St. § 9441), reciting that invention may be used by federal government or by any person in the United States without payment of royalty, before patent was issued, was permitted to amend application and pay statutory fee, on which patent was issued under Rev. St. § 4886, as amended by Act March 3, 1897, c. 391, § 1 (Comp. St. § 9430), he was not estopped to deny that invention was dedicated to public, under Act March 3, 1883, as against alleged infringer, not shown to have any knowledge of original application until after patent was issued.

8. Patents ⊂⇒73—Filing date of original application, not date on which fee was paid, held "filing date," as respects defense of prior publication (Comp. St. §§ 9430, 9441).

Where employee of War Department, who filed application for patent under Act March 3, 1883 (Comp. St. § 9441), before patent was issued, amended application and paid statutory fee, on which patent was issued under Rev. St. § 4886, as amended by Act March 3, 1897, c. 391, § 1 (Comp. St. § 9430), held, that date when original application was filed was filing date, as respects defense of prior publication, based on contention that filing date was day when fee was paid.

9. Patents ⊂⇒283(1)—Rights of government in invention patented by War Department employee were not available to alleged infringer.

Whatever rights United States may have in invention patented by employee of War Department is not available as defense to alleged infringer, sued by patentee's assignees, since assignees acquired full legal title, which must be recognized in court of equity until superior equities are asserted.

In Equity. Patent infringement suit by the Hazeltine Corporation and others against the Electric Service Engineering Corporation. Decree for plaintiffs.

Suit for infringement of Hazeltine patents, No. 1,450,080 and No. 1,489,228—the first for a method and electric circuit arrangement for neutralizing capacity coupling, application filed August 7, 1919, patent issued March 27, 1923; the second for a method and means for neutralizing capacity coupling in audions, application filed December 28, 1920, patent issued April 1, 1924. The claims in suit are claims 1 and 5 of patent No. 1,450,-080, reading as follows:

"1. In a system of two electric circuits coupled through a junction point and through a capacity, means for neutralizing the capacity coupling comprising a coil connected between said junction point and one terminal of said coupling capacity, and an auxiliary coil and a neutralizing capacity unequal to the coupling capacity connected between said junction point and the other terminal of the coupling capacity, said coils being closely coupled electromagnetically and having a ratio of turns equal to the inverse ratio of the capacities with which they are respectively associated."

"5. An electric circuit arrangement for neutralizing capacity coupling between an electric circuit and an inductive coil comprising an auxiliary coil electromagnetically coupled and connected to said coil with terminals of unlike polarity connected together, said auxiliary coil being interposed in the electrostatic field created between said coil and said circuit."

And claims 1 and 2 of patent No. 1,489,-228, reading as follows:

"1. An electric circuit arrangement for neutralizing capacity coupling between the grid and plate circuits of an audion due to the capacity between the grid and plate electrodes, comprising a coil connected between one of these electrodes and the filament system and an auxiliary coil and a neutralizing capacity connected in series between the other of these electrodes and the filament system, said auxiliary coil being coupled electromagnetically to the first coil with a coefficient of coupling substantially equal to unity and having a ratio of turns thereto equal to the ratio of the coupling capacity to the neutralizing capacity.

"2. An electric circuit arrangement for neutralizing capacity coupling between the grid and plate circuits of an audion due to the capacity between the grid and plate elec-trodes, comprising a coil connected between one of those electrodes and the filament system and an auxiliary coil and a neutralizing capacity connected in series between the other of these electrodes and the filament system, said auxiliary coil being coupled electromagnetically to the first coil with a coefficient of coupling substantially equal to unity and having a ratio of turns thereto equal to the ratio of the coupling capacity to the neutralizing capacity, said ratio differing from unity."

The alleged infringing device is a commercial radio receiving set, designed for domestic use in the reception of broadcasting.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis and Willis H. Taylor, Jr., both of New York City, of counsel), for plaintiffs.

Leonard Day, of New York City (William L. Morris, of New York City, of counsel), for defendant.

THACHER, District Judge (after stating the facts as above). [1] The Hazeltine method of neutralizing capacity coupling between two electrical circuits relates primarily to the art of radio reception, although the claims of his first patent are not confined to use in this field. The development of this art by Fleming, De Forest, and Armstrong is shown in Marconi Wireless T. Co. v. De Forest Radio T. & T. Co. (C. C. A.) 243 F. 560, and Armstrong v. De Forest Radio Telephone & Tel. Co. (C. C. A.) 280 F. 584. The use of the audion as a detector by Fleming, its perfection by De Forest, and its employment by Armstrong in his regenerative feedback system of amplification, presented a new problem, because the audion itself, under the influence of regenerative amplification, was converted into an independent generator of continuous oscillations. These oscillations produced in the receiving instrument "squeals," "howls," and "whistles," which drowned out the incoming signal.

The cause of these unwelcome disturbances was the capacity coupling between the primary and secondary circuits of the radio receiver and between the plate and grid circuits of the audion. By neutralizing the currents flowing through these capacity couplings, Hazeltine succeeded in eliminating the oscillating disturbances. This he accomplished by arranging an auxiliary circuit, so associated with the plate and grid circuits, through capacity coupling with one and electromagnetic coupling with the other, that the magnetic effect of the current in the auxiliary circuit completely and permanently neutralized the

disturbing voltages resulting from the capacity coupling between the two circuits. The utility of his accomplishment is demonstrated by the extraordinary commercial success of the neutrodyne receiving sets manufactured and sold under license from the plaintiff. Five per cent. royalties paid under such licenses from April 1, 1923, to September 30, 1925, amounted to $1,161,103.30. For the three months ending December 31, 1924, those royalties amounted to $378,730.54.

In support of the defense of priority of invention, and to show the state of the prior art, reference is made in the pleadings and proofs to several prior patents. Of these the patents to Alexanderson, August 12, 1919, No. 1,313,042, to Rice, March 16, 1920, No. 1,334,-118, and to Goldsmith and Weinberger, November 8, 1921, No. 1,396,571, were all issued after the date of Hazeltine's invention; the filing date of the application upon which his first patent issued being August 7, 1919. These three patents are not, therefore, in the prior art, and are material only if, from their disclosures, whether claimed or unclaimed, it appears that Hazeltine was not the first inventor of the inventions claimed in the patents in suit. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651.

Of these patents Rice more nearly approaches anticipation than any of the others. His objective was the same as Hazeltine's, "to avoid the undesired production of oscillatory currents," which he said "is due to the coupling which is always present between the grid and plate circuits." He proposed to neutralize the electromagnetic coupling between the circuits by a second electromagnetic coupling in the opposite direction, and then states: "This coupling may also be made great enough to compensate for the capacity coupling, but in case it is so arranged it will be correct only for one particular frequency, and in case the tuning of either of the circuits is varied the degree of the coupling also will have to be varied."

Permanent neutralization of capacity coupling for all frequencies, without variation of "the degree of coupling," was neither accomplished nor claimed by him. This Hazeltine did accomplish by closely and permanently coupling the auxiliary coil with the coil with which it is coupled in the other circuit, and by permanently adjusting the ratio of the neutralizing and coupling capacities in the two circuits, so as to equal the inverse ratio of turns on the coils with which they are associated. This adjustment is accomplished by means of a neutralizing capacity, constructed so that it can be delicately adjusted and soldered in place after the individual receiving set has been completely built and is ready for shipment. If the adjustment is properly made, as it can easily be, the capacity coupling remains completely neutralized, until some change is made either in the grid or plate circuit. This permanent and complete neutralization of the neutrodyne receiving sets before sale to the consumer explains the commercial success of these instruments, which is so strongly persuasive of invention.

Rice employed a fixed ratio of equal capacities and equal turns, and arranged his coils with loose coupling. Hazeltine provided close coupling between the coils and unequal turns, with capacities in the ratio stated, and attained permanent neutralization for all frequencies, a result never attained before, and one which had, as the evidence discloses, an astounding effect upon the entire industry. In Electrical Signal Co. v. Hall Signal Co., 114 U. S. 87, 5 S. Ct. 1069, 29 L. Ed. 96, in comparing a patented signaling apparatus for railroads with an alleged infringing apparatus, it is said: "One plan proceeds upon the idea of unequal circuits, to be afterwards equalized; the other adopts and embodies the idea of avoiding the necessity of subsequent rectification by an original adjustment of equal resistances. The difference is inherent in the two combinations and is substantial."

Here the difference between Hazeltine and those who preceded him is much the same, and is of the most essential importance from a functional standpoint and of extraordinary commercial value. Rice and Hazeltine were not very far apart, but the difference between them is the difference between success and failure. I accept the following statement of Professor Pupin in regard to these differences:

"In the Rice patent, the electromagnetic coupling between the two halves of the coil 4 is not even mentioned. In the Hazeltine application the coupling is stated to be 'close' and is indicated in the mathematical portions of the application to be 100 per cent. Hence the neutralization of capacity coupling and the consequent elimination of feedback action aimed at by both inventors will be produced by Hazeltine alone. Rice secures only partial neutralization when he produces any at all; whereas, with the 'close' coupling of the Hazeltine arrangement, the added capacity $C_2$ can be adjusted once for all to give neutralization which is not disturbed by adjustments of the circuits.

"Since Rice eliminates the feedback action only partially, when he eliminates it at all, it is obvious that oscillation of the vacuum tube will cease to be prevented as soon as the amplifying power passes beyond a certain definite lower limit; whereas Hazeltine, with complete neutralization of capacity coupling, may carry the amplifying power to any practicable extent without producing feedback action. Hazeltine also shows an arrangement, not present in the Rice device, which is apparent from even a most superficial examination—Figure 2 of the application. In this figure we have a coupling capacity between the grid and a coil electromagnetically coupled to a coil in the plate circuit—an arrangement which under certain conditions offers substantial advantages and which is not even suggested in the Rice patent."

This statement was made with particular reference to the second Hazeltine patent. Except with regard to 100 per cent. coupling, it applies to the first as well.

There is nothing in the Alexanderson patent, or the Goldsmith and Weinberger patent, which anticipates Hazeltine. Alexanderson's object was to provide means for neutralizing the effect of radio frequency waves transmitted from a duplex transmission and reception station upon reception apparatus at the same station. He describes his invention as follows: "In order to overcome the effect in the receiving apparatus of the waves impressed upon the receiving antenna from the transmitting antenna, I derive from the transmitting antenna, an electromotive force equal in value and opposite in direction to the potential induced upon the receiving antenna from the transmitting antenna, and impress this electromotive force upon the receiving circuit in such a manner as to neutralize in the receiving apparatus the effect of the induced potential."

Goldsmith and Weinberger had the same objective; i. e., to eliminate the interference in the receiving apparatus capacitively induced by the operation of the transmitting apparatus. This problem was not unlike the problem which confronted Rice and Hazeltine, although in a different field, and the means employed for solution are not in all respects entirely dissimilar. A certain similarity of method was necessarily inherent in their inventions, because they were all concerned with the same forces and presumably guided by the same knowledge of the physical laws governing those forces.

[2] Statutory law is not concerned with the laws and processes of nature, which govern the operations of electrical forces, but with the visible and tangible means and methods humanly devised to control and employ those forces for useful purpose. Marconi Wireless T. Co. v. De Forest Radio T. & T. Co. (C. C. A.) 243 F. 560, 562. All of these patentees attempted to get rid of an undesired induced potential by opposing to it in the same circuit an electromotive force equal to it in value, but opposite in direction. The features which distinguish Hazeltine's method from all others are the closely coupled coils in combination with an adjustment of coupling capacities in the inverse ratio of turns. To these features must be ascribed the permanent balance and neutralization which was not attained by any of the other patentees. The visible and tangible means for neutralizing capacity coupling disclosed by Hazeltine was his invention, not that of Alexanderson, of Rice, or of Goldsmith and Weinberger.

Nor was there anything in the art prior to Hazeltine which deprives his invention of validity. Only two prior art patents are in evidence—J. S. Stone, August 16, 1904, No. 767,970, and A. H. Armstrong, June 16, 1908, No. 890,593. The Stone patent shows knowledge and application, in an apparatus for simultaneously transmitting and receiving space telegraph signals, of the neutralizing effect of two equal, but opposite, potentials in the same circuit, and discloses a method for obtaining this result. The Armstrong patent shows an application of the same principle in maintaining the catenary suspending wire of an overhead trolley system at a potential approximately equal, but opposite, to that of the trolley wire; Armstrong's purpose being to neutralize the effect of the alternating current used in the operation of the trolley system upon neighboring telephone and telegraph wires. These prior art patents serve to disclose familiarity of those skilled in the art with the natural laws which operate in the Hazeltine method of neutralization, but do not disclose the visible and tangible methods of neutralization which form the subject-matter of his patents.

After the plaintiff had rested its case in rebuttal, and its expert had been excused and could not be recalled, the defendant offered in evidence an additional prior art patent, R. V. L. Hartley, May 23, 1916, No. 1,183,875. To have received the patent in evidence at that time, to the prejudice of the plaintiff, would have been unfair, because the proofs on both sides with regard to the prior art had been

closed and the plaintiff's witness had left the jurisdiction. However, I have considered the Hartley patent, and find no anticipation of Hazeltine therein, or any disclosure which deprives his invention of novelty.

[3-5] With respect to Hazeltine's second patent, the defense of double patenting is asserted. The question whether claims 1 and 2 of the second patent are invalidated by claim 1 of the first patent need not now be decided. Claims 1 and 2 of the second patent each provide for an electromagnetic coupling between the two coils, "with a coefficient of coupling substantially equal to unity." Claim 1 of the first patent provides only for "close coupling." The claims of the second patent must therefore be strictly construed for two reasons: First, because an interpretation equivalent in meaning to the claims of the first patent would invalidate them; and, second, because the second patent is for a combination of known elements comprising a particular method or means by which the neutralization of the grid and plate circuits of an audion is accomplished.

In such a patent every element specified by the patentee as entering into the combination must be accepted as material, and there can be no infringement if a single element is omitted from the infringing device, unless the omission is supplied by an equivalent device or instrumentality. Sargent v. Hall Safe & Lock Co., 114 U. S. 63, 86, 5 S. Ct. 1021, 29 L. Ed. 67. It is conceded that the electromagnetic coupling between the two coils in the alleged infringing device does not exceed 72 per cent. of unity coupling. Obviously such a degree of coupling, although it may be "close," is not "substantially equal to unity." Assuming, but not deciding, that claims 1 and 2 of patent No. 1,489,228 are valid, it is clear that they are not infringed by the defendant's device in evidence. Nor does this device embody the particular arrangement of coils covered by claim 5 of the first Hazeltine patent, or any equivalent thereof.

Consideration of infringement is therefore confined to claim 1 of the earlier of the two patents in suit. It must be noted that this claim provides that the coils shall be "closely coupled electromagnetically." There is no requirement for substantial unity of coupling, as in the claims of the second patent. To those skilled in the art to whom the instruction of the patent is addressed, close coupling is well understood, and the term is sufficiently definite, because the proper degree of electromagnetic coupling required to neutralize

the particular receiving set can be easily determined under the "try it and see" rule. It was quite sufficient for the patentee to state, as he did, that the coupling should be close, without attempting to state the exact degree of coupling requisite to neutralization at all frequencies. American Stainless Steel Co. v. Ludlum Steel Co. (C. C. A.) 290 F. 103, 108.

The schematic circuit diagram of the defendant's receiving set discloses that in each audion circuit arrangement the grid and plate circuits are "coupled through a common junction point" (at the filament terminal) "and through a capacity" (the coupling capacity existing between the grid and the plate). A coil is "connected between said junction point and one terminal of said coupling capacity" (the plate terminal). "Connected between said junction point and the other terminal of the coupling capacity" (the grid terminal) there is "an auxiliary coil" (the tapped-off portion of the secondary coil having 15½ turns) "and a neutralizing capacity." Thus the physical set-up is precisely in accordance with the claim. But the claim is limited by further requirements that the neutralizing capacity shall be unequal to the coupling capacity, that the coils shall be closely coupled electromagnetically and shall have a ratio of turns equal to the inverse ratio of the capacities with which they are associated.

Relying upon these limitations, the defendant, denying infringement, insists that it has not been shown that the coils in its device are "closely coupled electromagnetically," or that they have "a ratio of turns equal to the inverse ratio of the capacities with which they are respectively associated." The physical embodiment of the neutralizing capacities in the grid circuits of the first two audions is found in the little instruments of glass, wire, and brass soldered in place upon the supporting bar to which the cylinders upon which the coils are wound are attached. These instruments are so constructed that by the movement of the brass jacket the ratio of the capacities may be varied and adjusted to complete neutralization. When this adjustment is made, as it can be, by means of a simple test for ascertaining the presence or absence of capacity coupling, the brass jacket is soldered in place and permanent neutralization thus attained. The defendant's device has been so adjusted, and the tests to which it was subjected disclosed that this permanent adjustment has resulted in complete neutralization of capacity coupling.

Without attempting to restate the laws of

physics which govern the flow of electric currents in circuits capacitatively and electromagnetically coupled, and the influence thereon of inductance and impedance, it will suffice to say that from these laws it is manifest, as stated by the plaintiff's expert, that when the defendant's set is thus permanently adjusted for the neutralization of capacity coupling the ratios of capacities and of turns upon the coils stated in claim 1 of the first patent in suit must, of necessity and by virtue of physical law, exist. So far as the coupling of the two coils is concerned, the tests disclosed that the electromagnetic coupling between the tapped-off portion of the secondary coil is 72 per cent. of unity. The highest degree of electromagnetic coupling attainable between two coils constructed under ideal conditions is 95 per cent. of unity.

While the degree of coupling indicated by the tests is subject to qualification, because the tests were made with the coils removed from their environment in the receiving instrument, it is clearly established that, whatever the precise degree of coupling between these two coils may be, it is sufficiently close to produce the desired results. The physical structure of the two coils alone discloses that the coupling is certainly not loose. Physically the two coils are as closely associated as they well may be, and they could hardly be more closely coupled unless interwoven or by the use of iron cores.

The physical structure is in itself a testimonial of infringement. The structure of the coils shows the designer's purpose to closely couple them. The adjustable character of the neutralizing capacities affords means by which the capacity ratios may be delicately adjusted as the last step in the construction of a permanently neutralized instrument. The designer's purpose to attain neutralization through the use of closely coupled coils, and the adjustment of the ratios of coils and capacities, is therefore apparent. It must be held that the defendant's device infringes claim 1 of the first patent in suit.

[6] On August 7, 1919, the original application upon which patent No. 1,450,080 was subsequently issued was filed by Hazeltine pursuant to the Act of March 3, 1883, c. 143, 22 Stat. 625 (Comp. St. § 9441), which provides:

"The Secretary of the Interior and the Commissioner of Patents are authorized to grant any officer of the government, except officers and employees of the Patent Office, a patent for any invention of the classes mentioned in section forty-eight hundred and eighty-six of the Revised Statutes, when such invention is used or to be used in the public service, without the payment of any fee: Provided, that the applicant in his application shall state that the invention described therein, if patented, may be used by the government or any of its officers or employees in the prosecution of work for the government or by any other person in the United States, without the payment to him of any royalty thereon, which stipulation shall be included in the patent."

Upon filing this application the statutory fee of $15 was not paid, and the following statement was included in the application: "This application is made under the Act of March 3, 1883, chapter 143 (U. S. Statutes, XXII, p. 625), and the invention herein described and claimed may be used by the government of the United States or any of its officers or employees in the prosecution of work for the United States, or by any person in the United States without the payment of any royalty thereon." December 18, 1920, Hazeltine filed a petition with the Commissioner of Patents, praying that letters patent be issued to him upon the original application, and paid the statutory fee of $15. Thereafter the original application was amended by striking out the statement quoted above, which refers to the Act of March 3, 1883 (22 Stat. 625). The patent was subsequently issued to Hazeltine pursuant to R. S. § 4886, as amended (Comp. St. § 9430).

Upon this record in the Patent Office the defendant claims the right under the Act of March 3, 1883, to use Hazeltine's invention in the United States without the payment of royalties. When the original application was filed Hazeltine was employed by the War Department, his work being connected with the improvement of radio reception methods. Relying upon the opinion of the Judge Advocate General of November 30, 1918, a reference to which will be found in Squier v. American Tel. & Tel. Co. (C. C. A.) 7 F.(2d) 831, which was officially communicated to him, Hazeltine filed his application under the Act of March 3, 1883, without any intention of surrendering his commercial rights in the invention, and in reliance upon the opinion of the Judge Advocate General that the granting of a patent to him under that statute would secure to himself a patent monopoly exclusive of all persons in the United States, except for use in the prosecution of work for the government.

Thereafter, doubt arising as to the correctness of this construction, Hazeltine promptly

asked leave to amend his application and pay the statutory fees. This was permitted by the Commissioner of Patents, and the patent now in suit was issued to him, not under the Act of March 3, 1883, but under R. S. § 4886, as amended. It must be quite obvious from a reading of the statute that there can be no dedication thereunder until its provisions become operative by the grant of a patent. No patent was granted to Hazeltine under this statute. Therefore he was free, with the approval of the Commissioner, to amend his application and, in the usual course of Patent Office procedure, to obtain such letters patent as might be issued to him, free of all obligation under the Act of March 3, 1883. The question of construction, which may perhaps be left open by the decision in Squier v. American Tel. & Tel. Co., supra, does not arise here, because the inventor did not take out a patent under the Act of March 3, 1883, and there was no dedication of his invention to the uses defined in that statute. It is therefore of no consequence whether the statute contemplates dedication to a purely private use or not. The defendant acquired no rights under the Act of March 3, 1883, because the patent was not issued under that act.

[7] Coupled with the assertion of rights under this statute is a defense of estoppel. This is without merit, because it is not shown that the defendant had any knowledge of the original application until after its amendment and the issue of a patent to Hazeltine under R. S. § 4886.

[8] There is also a defense of prior publication, founded upon the contention that Hazeltine's filing date is not the day when the original application was filed, but the day upon which the filing fee was paid, over two years later. This contention cannot be sustained, because the procedure was by amendment of the original application, which is the application upon which the patent subsequently issued. Its filing date is the day upon which it was filed, not the day upon which the fee was paid.

[9] Nor is there any merit in the claim that Hazeltine's assignee is not entitled to sue. Whatever rights the United States government may have in the invention, growing out of the inventor's employment, the patent was issued in his name, and his assignees hold the full legal title, which must be recognized in a court of equity until superior equities are asserted.

A decree in favor of the plaintiffs for appropriate relief in accordance with this opinion may be presented upon the usual notice.