### YABLICK v. PROTECTO SAFETY APPLIANCE CORPORATION.

Circuit Court of Appeals, Third Circuit.
September 13, 1927.

Rehearing Denied Oct. 22, 1927.

No. 3565.

1. Patents ⟺328—Perrott & Yablick, 1,559,980, for gas mask held valid and infringed.

Perrott & Yablick patent, No. 1,559,980, for gas mask apparatus and process of removing ammonia from the air before it enters the mask, *held* not anticipated, valid, and infringed.

2. Patents ⟺21—Substituting copper sulphate for substances previously used as ammonia absorbent in gas mask apparatus held invention.

Substitution of copper sulphate for other substances previously used as an ammonia absorbent in a gas mask apparatus, producing a more efficient and satisfactory result, *held* to constitute invention.

3. Patents ⟺36(2)—That patented process came immediately into general use, replacing like processes, is persuasive of invention.

That a patented process came immediately into general use and has replaced all other like processes is persuasive of invention.

On Motion for Rehearing.

4. Master and servant ⟺62—Generally, one employed to devise means for accomplishing prescribed result cannot plead title to improvement as against employer, whether the United States or another.

The general rule is that, if one is employed to devise or perfect an instrument or means for accomplishing a prescribed result, he cannot, after successfully accomplishing such work, plead title thereto as against his employer, which rule applies equally, whether the United States or another be the employer.

5. Patents ⟺283(1)—In suit for infringement of patent perfected by government employee, possible equities in favor of government were not available to defendant.

In action for infringement of gas mask, perfected by government employee, defendant could not successfully assert possible equities existing in favor of the government as a defense.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

In Equity. Suit by Max Yablick against the Protecto Safety Appliance Corporation.

From a decree dismissing the bill, and a decree denying leave to file a supplemented bill, complainant appeals. Latter decree affirmed, and former decree reversed, with directions.

Dean, Fairbank, Obrieght & Hirsch, of New York City (Clair W. Fairbank, Irving M. Obrieght, and Morris Hirsch, all of New York City, of counsel), for appellant.

Archibald Cox, of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from two decrees of the District Court. The first decree dismissed the bill of complaint on the ground that United States letters patent No. 1,559,980, issued November 3, 1925, to George St. J. Perrott and Max Yablick are invalid, and the second denied a motion for leave to file a supplemental bill and bring before the court newly discovered evidence.

[1] The patent relates to the treatment of air laden with ammonia so as to render it suitable for breathing. All ten claims of the patent are in issue except the fifth. The first and second claims are typical. The first is for an apparatus and the second is for a process. The apparatus consists of a can or canister containing copper sulphate, a gas mask, and a hose connecting the can and the gas mask. The process consists in passing air vitiated with a high concentration of ammonia through a can or canister containing a dry, solid, granular mass of hydrated copper sulphate, then through a hose into a mask from which the purified air is inhaled. Air enters the can at the bottom, passes through the copper sulphate which absorbs the ammonia, and then passes on through the hose into the mask, and is breathed by the wearer of the mask.

The suit is for the infringement of the patent. The defendant raised three questions, which were stated by the learned District Judge as follows:

"The sole question is validity. The defense, for convenience, divides into the following divisions: (1) That there was no invention over the prior art; (2) that the defendant in the manufacture and sale of its product completely anticipated the patent; and (3) that the patentees were employed for the specific purpose of building the gas mask patented while in government service, and hence no valid patent can issue."

The first question is whether or not what

the patentees did amounted to invention or to no more than any one skilled in the art would do in the ordinary and natural development of the art.

Copper sulphate, when crystallized in small crystals on the surface of a carrier such as pumice stone, has a great avidity for ammonia gas, and has proved to be the best and most efficient absorbent of ammonia gas from the air. It so completely absorbs ammonia (one of the most powerful alkalis and hardest to remove from the air) that a person wearing the device of the patent can remain 175 minutes in air containing 5 per cent. of ammonia gas fumes. Its superiority over other materials consists in part in the fact that the heat of reaction under ordinary circumstances is very low and will not raise the temperature of the air to any appreciable degree; caustic fumes are not evolved during the absorbing reaction; resistance to the passage of air through it is small; the weight is low in respect to the ammonia which it can absorb; the absorbed ammonia is effectively retained under the conditions in which it is absorbed, and the absorbent is cheap, easily prepared, and stable while stored for use.

The record shows that no one, prior to the invention of the patentees, commercially and successfully used in a gas mask canister an absorbent for ammonia except an acid which by chemical union with the ammonia would hold it as a fixed salt. Sulphuric acid was generally used as an absorbent prior to the discovery of the patentees. Not a prior patent or publication has been cited that discloses the use of copper sulphate as an absorbent for ammonia in a gas mask. The record does not show that any one prior to the patentees ever invented a process or an apparatus whereby copper sulphate as an absorbent of ammonia gas was used in a canister as a constituent and important part of a gas mask. Sulphuric acid for some time prior to the patent was used on pumice in gas masks, but the acids combined with the metal of the canister and the reaction heated the air and produced fumes which were injurious to the wearer of the mask.

The defendant relies upon the British patents No. 3348 (1871) to Eveleigh, and No. 241 (1901) to Burgess, and upon the textbook on chemistry by Sadtler and Coblentz (1910), which states that "anhydrous copper sulphate absorbs gaseous ammonia with great avidity."

Eveleigh devised means of removing ammonia from illuminating gas. He says that, in the ordinary method of purifying gas employed prior to his patent, the bulk of the ammonia was removed by contact with water or ammoniacal liquor, and a portion of the remainder in oxide of iron or lime purifiers, but ordinarily as the gas passed through the last lime or oxide of iron purifier a certain portion of ammonia was liberated and passed on in a free state along with the gas to the holders. What Eveleigh invented was the use of a metallic salt, such as sulphate of iron, in crystals, for the removal of ammonia from gas when applied after the gas had passed the oxide of iron or other purifier. This he did by laying the metallic salt, which had been reduced to crystals the size of peas, on sieves to a thickness of from two to eight inches in one or more layers. By this process there was obtained sulphate of ammonia in a highly marketable form and ammoniuretted metallic oxide.

The Burgess patent relates to a process of treating and purifying acetylene gas so as to remove the matter which fouls and otherwise deleteriously affects gas tips or burners. The process consisted in passing the gas from a generator through a condenser (designed to remove moisture from the gas) into a purifying chamber containing several trays of charcoal which had been immersed in a solution of sulphate of iron which permeated it. As the gas passes over the charcoal, permeated with a dry solution of sulphate of iron, the impurities of the gas are brought by the occlusive properties of the charcoal into intimate contact with the metallic salt which removes the impurities from the gas. From this chamber the gas is passed through other chambers containing lava which removes the vesicles of the oily hydrocarbons in the gas, and which, if left in the gas, will be absorbed by the burners which are usually made of lava substance.

Sadtler & Coblentz taught a single, isolated fact of chemistry, but so far as the record discloses, no use had been made of it which in any way relates to the invention in question. This fact was not translated into commercial utility until the genius of the patentees did it.

The particular problem which the patentees solved was never before Eveleigh, Burgess or Sadtler & Coblentz. The disclosures of Eveleigh, Burgess, and Sadtler & Coblentz were all brought to the attention of the Patent Office, which after full consideration issued the patent. The invention of a gas mask which would meet the exigencies of the war and thereafter protect the worker from the fumes of ammonia was the problem which confronted the Chemical Warfare Research Division of the army. Scores of experts were

working on this problem, but the patentees alone solved it.

[2] Did the solution rise to invention or was it merely the result which any one skilled in the art would have reached? That of the scores of experts in the army, who were skilled in the art, and who were trying to solve this problem, the patentees alone did it, is a persuasive answer. It has been suggested that the substitution of one substance for another in a process does not constitute invention. Under some circumstances it may not, but under others it may. In the case of Low v. McMaster (C. C. A.) 266 F. 518, Judge Woolley, speaking for this court, tersely stated the law on this subject as follows:

"On this subject it is the law that, merely to substitute superior for inferior materials, in making one or more or all of the parts of a machine or manufacture, is not invention, although the substitution may be of materials that are both new and useful in high degree. It is also the law, as exceptions to this general rule, that, if the substitution involved a new mode of construction, or if it developed new properties and uses of the article made, or where it produces a new mode of operation, or results in a new function, or when it is the first practical success in the art in which the substitution is made, or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention."

The facts of the case at bar bring it within the principles of the law announced in the above case. The selection of one material, and that by a process of exclusion even where the inventor stumbled on the discovery, has been held to constitute invention. Naylor v. Alsop Process Co. (C. C. A.) 168 F. 911, 919; Van Heusen Products v. Earl & Wilson (D. C.) 300 F. 922, 929; International Cork Co. v. New Process Cork Co. (C. C. A.) 6 F.(2d) 420. In the case of the Toledo Rex Spray Co. v. California Spray Chemical Co. (C. C. A. 6) 268 F. 201, the substitution of arsenic acid for sulphuric acid in making arsenate of lead was held to constitute invention. The court said that during the forty years of making arsenate of lead it had not occurred to any one to substitute arsenic acid for sulphuric acid. The substitution proved a great commercial success.

[3] It was known by a few persons that copper sulphate would absorb ammonia gas, but the knowledge of that abstract chemical fact, which no one used, is quite different from the disclosures of the patent. The patentees translated a more or less isolated and hitherto comparatively unimportant fact of chemistry into a useful industry. That the process came immediately into general use and has replaced all other like processes is persuasive of invention. Minerals Separation v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286.

Did the defendant anticipate the patent by making and selling gas masks in which copper sulphate was used as an absorbent? There is no question but that copper sulphate is the best absorbent of ammonia known for gas masks. The Armistice was signed on November 11, 1918, and the invention of the patent was discovered some time prior to October 28, 1918, the date of the first written report of the patentees on the subject of ammonia absorbents which disclose the invention here claimed. The application for the patent was filed on January 10, 1919. The president of the defendant company testified that he made and sold gas masks embodying the device of the patent more than two years before the application for the patent was made. He wrote the Commissioner of Patents on May 17, 1921, that he had been "using granular pumice stone impregnated with ammonia absorbing chemical since 1914. * * * We refer to the use of copper sulphate, because that is the chemical we are using and have been using for years." If these statements are true, his silence as to the invention is inexplicable. The government and her allies were engaged in the greatest struggle and most cruel war of all time. They were making desperate efforts to discover some means of protecting their soldiers against ammonia fumes in the nitrate plants. If he had known of any absorbent better than sulphuric acid, as copper sulphate admittedly is, it is unbelievable that he would not have disclosed that fact and have supplied the government in her desperation with the protection so badly needed. That he did not do so, if he is now telling the truth, is unthinkable. What he then did contradicts what he now says.

His proofs of prior invention consist of oral testimony supplemented by certain exhibits. Oral testimony of prior use was given by Mr. Davidson and one or two employees and personal friends. Not a single "user" was called.

The trial judge said: "Davidson contradicted himself in some minor particulars. He was never quite certain about exact dates and his mind never seemed to lend itself to exact recollection. * * * Davidson and his corroborating witnesses never quite agree upon dates, except that they all agree that the copper sulphate filling was used more than two years before the patent was applied

for." There is no explanation as to how they came to agree on the one fact essential to defendant's case and disagree on almost every other fact. The establishment of prior use by oral testimony, when not supported by some concrete, visible, contemporaneous proof, is unsatisfactory. As Chief Justice Taft said in the case of Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 60, 43 S. Ct. 322, 327 (67 L. Ed. 523), there is such a "temptation to remember" what is desired. Psychological suggestion is so subtile and insinuating that oral testimony is hardly trustworthy as to facts long past. Inflexible Company v. Megibow (D. C.) 251 F. 924; Searchlight Horn Co. v. Victor Talking Machine Co. (D. C.) 261 F. 395; Mead-Morrison Mfg. Co. v. Hauck Mfg. Co. (D. C.) 10 F.(2d) 834.

In addition to the unsatisfactory character of the oral testimony as to dates and facts, Ewald Voos, an employee of the defendant company, testified that he began work with the company in November or December of 1917, and six months thereafter he first became acquainted with the absorbent then used in the company's canisters. Sulphuric acid was the absorbent used, he says, on pumice stone. Some time in 1919 the company began to experiment with copper sulphate. If he, a disinterested witness, is to be believed, Mr. Davidson is mistaken as to his dates. Defendant's silence at a time when self-interest and patriotism demanded that it speak corroborates Voos and contradicts its president.

The defendant offered several exhibits at the trial to support the testimony of its witnesses as to prior use. The complainants had no opportunity to investigate the facts they contained or the testimony. After the trial, they did so, and thereupon filed a petition in which they charged that the testimony about them was untrue and that the court had been imposed upon. They prayed for leave to file a supplemental bill in the nature of a bill of review. But the trial judge had found that the patent was invalid for want of novelty and very properly from his point of view denied the petition, because, if the patent was invalid for lack of novelty, the question of prior use was unimportant. But we think that the discovery of the patentees was new and useful and was not anticipated by prior use of the defendant. A supplemental bill is therefore unnecessary.

The judge below held that the patent was legally issued to the complainants, although they were at the time in the employ of the government. Squier v. American Tel. & Tel. Co. (C. C. A.) 7 F.(2d) 831. No appeal was taken from that finding, and so that question is not before us.

There is no question about infringement. The defense constitutes an admission of infringement. Defendant says it not only makes and sells the apparatus and uses the process of the patent now, but did so two years before the application was filed.

The decree of the District Court denying permission to file a supplemental bill is affirmed, but the decree dismissing the bill of complaint is reversed, with directions to reinstate the bill, enter a decree for the plaintiffs, and proceed with the accounting.

## On Motion for Rehearing

PER CURIAM. The defendant has applied for a rehearing on the ground that the patentees were employed by the government and "paid for the specific work of making the thing patented."

It does not appear that the plaintiff's title to the patent in question was put in issue by the pleadings or at the trial, but, on the other hand, the defendant entered into a stipulation wherein it was provided that it might "be taken as established and duly proved by competent evidence" that "the plaintiff, Max Yablick, is the owner of the letters patent of the United States No. 1,559,980, issued November 3, 1925." It further appears that the government recognized the title of the plaintiff to the patent in that it accepted a license under the patent from the plaintiff. [4] The general rule of law is that, "if one is employed to devise or perfect an instrument or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer." "There is no difference between the government and any other employer in this respect." Solomons v. United States, 137 U. S. 342, 346, 11 S. Ct. 88, 34 L. Ed. 667; Standard Parts Company v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033.

The Act of March 3, 1883, provides that the Commissioner of Patents may grant any officer of the government, except officers and employees of the Patent Office, a patent for any invention, when such invention is used or to be used in the public service, without the payment of any fee, provided the applicant in his application stipulates that the invention described therein, if patented, may be used by the government or any of its officers

or employees in the prosecution of work for the government, or by any other person in the United States, without the payment to him of any royalty thereon. This stipulation must not only be included in the application, but also in the patent when issued. 22 Stat. 625 (35 USCA § 45; Comp. St. § 9441). There is no evidence that the patent was issued without any fee, and it does not contain the required stipulation. Neither was the patent dedicated to the public. Hence the patent does not seem to have been applied for and issued under the above provisions of the statute, and the defendant did not acquire any rights therein as a member of the public.

The issuance of a license to the government presupposes title in the plaintiff, and not in the government. Standard Sanitary Manufacturing Company v. Arrott (C. C. A.) 135 F. 750. The patent was issued to the plaintiff, and he holds the full legal title, which must be recognized in a court of equity until superior equities are shown and this the defendant has failed to do.

[5] Whatever the equities between the government and the plaintiff are, they do not constitute a defense to infringement by a third party. The government alone can avail itself of the employment of plaintiff when the invention was discovered. In other words, the rights, whatever they may be, which *the government* may have in the invention by reason of the inventor's employment, are not available to the defendant. McMichael v. Ruth (C. C. A.) 128 F. 706; Wesson v. Galef (D. C.) 286 F. 621; Hazeltine Corporation v. Electric Service Engineering Corporation (D. C.) 18 F.(2d) 662.

The petitioner has not shown that it is entitled to the relief sought, and therefore a rehearing is denied.